[Civ. No. 69071. Second Dist., Div. Five. Mar. 26, 1984.]

ABI, INC., Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

Richards, Watson, Dreyfuss & Gershon, Mitchell E. Abbott and William L. Strausz for Plaintiff and Appellant.

Ira Reiner, City Attorney, Thomas C. Bonaventura, Senior Assistant City Attorney, Colin Chiu, Assistant City Attorney, and Dov S. Lesel, Deputy City Attorney, for Defendants and Appellants.

OPINION

AUERBACH, J.*—ABI Inc. (ABI), a land developer, filed an action against defendants City of Los Angeles and Crocker National Bank (sometimes collectively denominated City) seeking to recover approximately $38,000 in fees out of a total sum of $57,000 deposited with the defendants as a condition for participating in the City's 1980 Home Mortgage Revenue Bond Program. ABI's complaint was couched in four causes of action. The

---

*Assigned by the Chairperson of the Judicial Council.

first cause of action petitioned for a writ of mandate, while the second cause of action complained of breach of contract. The remaining causes sounded in unjust enrichment and declaratory relief. An alternative writ of mandate issued and after answer by the City and Crocker the matter was heard.

At the outset of the brief hearing, the court announced that the petition for mandate was denied on the grounds that an adequate remedy at law existed and that such an action against a public entity should proceed by civil action. However, at the suggestion of the court, both sides orally stipulated that the court could treat the proceeding as a motion for summary judgment on the contract cause of action. The court, after argument, and having received in evidence "all of the admissible evidence set forth in the declarations, exhibits and verified pleadings submitted," granted the motion for summary judgment in favor of plaintiff in the amount of $38,698, plus interest. The City has appealed from this judgment; ABI has cross-appealed from that portion of the judgment denying its petition for writ of mandate.

No contention is made that any triable issue of fact exists.

The issue of whether ABI is entitled to a refund of the fees in question depends primarily on the construction of two complex documents of a rather convoluted nature which spell out the contractual obligations of the parties and which interface with one another. They are respectively denominated as (1) the indenture and (2) the origination, service, and administration agreement (Agreement) and were drafted by City's bond counsel and its underwriters.

## I. BACKGROUND

In 1979, the Legislature enacted section 52000 et seq. of the Health and Safety Code which created the 1980 Home Mortgage Revenue Bond Program. Its purpose was to provide subsidized, low-interest home mortgage financing to enable persons of low and moderate income to purchase homes. Basically, this was accomplished by using the proceeds from the sale of tax exempt municipal bonds to provide mortgage financing to qualified buyers at an interest rate substantially below the then conventional home mortgage rate. By building dwelling units whose purchase prices do not exceed a prescribed limit, developers qualify to participate in the program and use the available below-market interest mortgage financing to attract qualified buyers.

In 1980, the City issued its 1980 Home Mortgage Revenue Bonds under this program. The bond obligations are not general obligations of the City, the sole source of repayment being revenues generated by the mortgages.

While the City provides the mortgage financing, the actual credit investigations and account maintenance services are performed by participating banks and lending institutions. Crocker acts as a trustee for the 1980 bonds and is responsible for handling the bond proceeds and assuring solvency of the bond program. The bonds are paid off with funds furnished by the home owners in the form of monthly payments on all the mortgages in the program. Of the two documents previously referred to, the indenture authorized the issuance of the bonds while the Agreement sets forth the rules and procedures to be followed by the participants in the program.

ABI's application to participate in the City's program was accepted on November 10, 1980, and the City agreed to purchase 90 percent home mortgages to be originated by ABI's lender, Coast Federal Savings and Loan Association (Coast), to a maximum aggregated amount of $803,000. As a condition of participation in the program, the developers and lending institutions were required to pay certain particularized fees, all of which were calculated as a percentage of the aggregate principal amount of the mortgages to be originated with respect to the units. The mortgage funds allocated to ABI's development project were reduced from $803,000 to approximately $766,700 and the requisite fees were proportionately reduced. Certain of the fees were nonrefundable;[1] restitution of these fees is not claimed in this action.

The two fees which form the crux of this controversy are the developer fee of $30,668 which ABI paid to the City and a lender's commitment fee[2] of $8,030 which by private arrangement between Coast and ABI was paid by ABI to Coast but which is a fee required by the Agreement to be paid to City by the lending institution (Coast).

After these fees were paid, ABI proceeded with its project of building 11 condominium units on Cadillac Avenue in Los Angeles. The low interest home mortgage program proved so popular with would-be home buyers that it was necessary to hold a lottery to select those buyers who would receive the mortgage financing. The final lottery for the program for which ABI was eligible was held on September 30, 1981. However, ABI was unable to obtain its final subdivision public report (also known as the White Report) prior to the date of the lottery. Alan Berenstein, president of ABI, attributed

---

[1] In this category are included a developer commitment fee of $8,030, a lender's application fee of $803 and a commitment fee of $8,030 (see fn. 2).

[2] The only terminology employed in the Agreement defining a lending institution's obligation to pay fees comes under the general heading of "Commitment Fee." To avoid confusion with other commitment fees which are nonrefundable, ABI's counsel has adopted the term Lender's Commitment Fees to distinguish these potentially refundable fees from the nonrefundable commitment fees (see fn. 1).

this to processing delays in the California Department of Real Estate and asserted that part of the delay was attributable to "bureaucratic bungling" within the City's own planning department. In this connection, Mr. Berenstein asserted that the California Department of Real Estate needed to know whether the Cadillac project was subject to "inclusionary zoning" in order to complete processing the White Report. He complained that the City's planning department delayed for over two months while trying to decide the question and before forwarding the necessary documents to the Department of Real Estate. He concluded that this delay, coupled with further unexplained delays in the Department of Real Estate, resulted in the issuance of the White Report subsequent to the time the lottery was held.

Since a developer may not lawfully sell units in a subdivision without first obtaining a White Report, ABI was unable to participate in the 1980 Home Mortgage Revenue Bond Program as planned, even though five lottery winners had loan applications approved and ready for processing by Coast. When it became apparent that ABI would not be able to secure the White Report in time to participate in the program, the $766,700 which had been allocated for the purchase of mortgages originating with ABI's units in Cadillac Avenue was reallocated to other developers as provided for in the Agreement. Following that reallocation, all 1980 bond proceeds were successfully applied to the purchase of qualified home mortgages.

Following the reallocation of funds, ABI made demand upon the City and Crocker for a refund of both the developer fee and the lender's commitment fee with negative results.

In urging reversal, appellants argue that the court improvidently granted the motion for summary judgment because, by the terms of the Agreement, ABI was not entitled to a refund of either the developer fee or the lender's commitment fee.

## II. The Distribution of Fees

The parties are in accord that sections 7(b) and 7(c) of the Agreement are crucial in the resolution of the question of the fees. We will discuss these sections in reverse order and touch upon germane provisions of both the Agreement and indenture as references arise. Since each of these sections contains definitions of the fees in controversy, we quote first from the Agreement.[3]

---

[3]The indenture broadly describes all fees paid by either a developer or a lender as follows: "'Commitment Fee' means any participation fee, commitment fee or points received by the Trustee in accordance with the Agreement from a Lending Institution or a developer participating in the Program . . . ."

" ' "Commitment Fee" means the fee, payable by each Lending Institution on or prior to the date of sale of the Bonds by City by means of a certified or cashier's check drawn in favor of Trustee for the benefit of the bondholders in an aggregate amount equal to one percent (1%) of the amount of the Home Mortgage funds allocated hereunder to such Lending Institution, or such other amount or method of payment as may be agreed to by City and each Lending Institution on or prior to said date of sale of the Bonds.'

" ' "Developer Fee" means the fee payable by each Developer prior to the sale of the Bonds by City by means of a certified or cashier's check drawn in favor of the Trustee or an irrevocable letter of credit drawn in favor of Trustee upon an AA-rated bank payable at any time up to 18 months after the issuance of the Bonds in an aggregate amount equal to 4% of the amount of Home Mortgage funds allocated to a Lending Institution and designated to be used on Developer's newly constructed Homes, or such other amount or method of payment as may be agreed to by City and each Developer on or prior to said date of sale of the Bonds.' "

Section 7(c) of the Agreement clearly preserves the distinction between these fees and sets forth how they are to be disposed of and distributed.[4] Although very long, it requires reproduction so that its nuances may be appreciated. It reads as follows:

" '(c) Fees. The Lending Institutions and Developers participating in the Program shall pay the following fees, as applicable:

" '(i) Upon reasonable notice by City or Trustee at or prior to the sale of the Bonds, each Developer shall deliver, or cause to be delivered, the Developer Fee and the Developer Commitment Fee to Trustee.

" '(ii) Upon reasonable notice by City or Trustee at or prior to the sale of the Bonds, each Lending Institution shall deliver, or cause to be delivered, the Commitment Fee to Trustee.

" '(iii) Trustee shall deposit the Developer Commitment Fee in the Mortgage Reserve Fund *and shall hold the Commitment Fee and the Developer Fee in a special custodial account separate from any funds or securities delivered to it under the Indenture or otherwise under this Agreement* and shall invest such Commitment Fee and Developer Fee in Investment Securities (as defined in the Indenture) pursuant to the written instructions of

---

[4]Section 7(c) of the Agreement also alludes to another fee called the developer commitment fee which is not in controversy.

each Lending Institution. Trustee shall transfer all interest or other income derived from the investment of the Commitment Fee and the Developer Fee to the Revenue Fund prior to each interest payment date on the Bonds and *shall hold the Commitment Fee and the Developer Fee until transferred pursuant to the provisions of subsections 7(c) (iv) and (vi) hereof or until returned to each Lending Institution or Developer pursuant to the provisions of subsection 7(c) (v) or Section 7(b) hereof.* At such time as all required transfers and refunds hereof have been made, Trustee shall deposit any remaining amount in the Revenue Fund. Trustee shall not be liable for any losses incurred as a result of the investment of the Commitment Fee and the Developer Fee pursuant to the provisions of this subsection 7(c) (iii).

" '(iv) *In connection with any redemption of the Bonds pursuant to Sections 3.03(c) and 4.01(a) of the Indenture,* if, in the judgment of trustee it is necessary to satisfy the Cash Flow Requirement (as defined in the Indenture), *Trustee shall transfer such portion of the Commitment Fee and the Developer Fee to the Redemption Fund, as may be required to enable Trustee to redeem Bonds in an amount sufficient so that, in the sole judgment of the Trustee, after such redemption, the Cash Flow Requirements will be satisfied.* Any amounts to be transferred hereunder shall be drawn (A) first, to the extent that a Lending Institution has failed on its part to deliver Home Mortgages to Trustee as set forth in Exhibit D hereto, from the Commitment Fee deposited with Trustee by such Lending Institution, and (B) second, to the extent that a Developer has failed to deliver Homes to a Lending Institution as set forth on Exhibit D hereto, from the Developer Fee deposited with Trustee by such Developer and (C) lastly, pro rata from all other available Commitment Fees and Developer Fees.

" '(v) Trustee shall reduce or return the Developer Fees from time to time as Home Mortgages are purchased by Trustee with respect to a Developer's newly constructed Homes. The Developer Fee delivered to Trustee by such Developer shall be reduced by an amount obtained by multiplying the original principal amount of the Developer Fee by the ratio obtained by dividing the principal amount of such Home Mortgage by the aggregate principal amount of all Home Mortgages to be made on such Developer's newly constructed Homes.

" '(vi) Upon the purchase of a Home Mortgage from a Lending Institution, Trustee shall transfer from the Commitment Fee deposited with Trustee by such Lending Institution to the Mortgage Reserve Fund an amount equal to 1% of the Outstanding Principal Amount of such Home Mortgage.

" '(vii) Notwithstanding anything to the contrary contained in this Section 7, no portion of the Commitment Fee or the Developer Fee shall be returned

if such portion is required to be applied in accordance with subsection 7(c)(iv) hereof.'" (Italics added.)

Succinctly stated, section 7(c) (iii) directs that the developer fee and the lender's commitment fee shall be held in a separate custodial account until they may be disposed of in five possible ways.

(1) Section 7(c)(iv) provides for transfer to the redemption fund.

(2) Section 7(c)(v) provides for a return of fees to the developer as he sells his homes under the program.

(3) Section 7(c)(vi) provides for diversion of a portion of the lender's commitment fee to the mortgage reserve fund when a home mortgage is purchased from lender.

(4) Section 7(b), to be discussed *infra,* states that no portion of a developer fee shall be reduced or returned by reason of a reallocation of funds and provides for the circumstances under which a refund may be made of the lender's commitment fee in the event of a reallocation of funds reserved by a developer through a lending institution for the purchase of home mortgages.

(5) Section 7(c)(iii) provides that after all required transfers and refunds have been made, trustee deposits any remaining amount in the revenue fund.

III. Section 7(c) Authorizes Transfer to Revenue Fund

Both sides agree that no redemption of funds occurred so that none of the fees in the special custodial account will require to be transferred into the redemption fund.[5] They draw opposite conclusions from this circumstance. City maintains that since there was no redemption and no refund required, the developer fee and the lender's commitment fee must be deposited in the *revenue fund* under the explicit directions of section 7(c)(iii) as to how to dispose of funds not transferred to the redemption fund or the mortgage reserve fund and not otherwise refunded.

ABI contends that since all of the 1980 bond revenues were in fact spent and it being conceded that no redemption has taken or can ever take place, the fees are required to be refunded to the payor. ABI argues that the only

[5]The 4 percent developer fee and the 1 percent lender's commitment fee provided a source of funds which could, if necessary, be used to redeem bonds in the event there were not enough qualified mortgages be purchased with the bond proceeds.

permissible use of the developer fee and the lender's commitment fee was to deposit them in the redemption fund, and if not so used, they were to be refunded.[6]

Although we are ultimately in accord with ABI's position to the extent that it claims entitlement to a refund of the developer fee, we do not accept its dogmatic statement that unless the fees were to be used in the redemption fund, they could not be deposited in the revenue fund. We pursue this argument so that our holding may be put in proper perspective.

The language of the Agreement belies the concept that the fees were exclusively earmarked for the redemption fund. In addition to its use for redemption, the developer fee could be returned, pursuant to section 7(c)(v), by the trustee to the developer as the trustee purchased home mortgages on the homes sold. Similarly, in addition to their use for redemption, the lender's commitment fee could be transferred into the mortgage reserve fund pursuant to section 7(c)(vi) upon the purchase of a home mortgage from the lending institution and could also be returned to the lending institution pursuant to section 7(b), as will later be discussed, in the event of a reallocation of home mortgage funds reserved by a developer resulting from developer's failure to deliver homes in a timely fashion where no suitable substitute is found.

Thus, ABI can draw no comfort from the fact that there was no redemption in the light of the language of section 7(c)(iii) providing that if the respective fees were not transferred to the redemption fund or the mortgage reserve fund or required to be refunded, they are to be diverted into the revenue fund.[7]

---

[6]ABI supports this position by the following rationale in its brief: "Because the solvency of the bond program depends upon a balance between the income (from payments on the home mortgages) and expenses (of payments of interest and principal to the bondholders) it was necessary to assure that *all* the bond proceeds were applied to the purchase of the income-producing mortgages. In the event that all the bond proceeds were *not* spent, the Developer Fee and the Lender's Commitment Fee were to be deposited into a Redemption Fund for purposes of redeeming the necessary number of bonds to restore the bond program to a balanced position." (Original italics.)

[7]ABI points out that in arguing to the trial court, the deputy city attorney stated that "the nonperforming developer's money should be kept because the money should go into the Mortgage Reserve Fund." This was an obvious inadvertence and not a change of position as contended by ABI. As appears from page 6, lines 12-16 and page 7, lines 3-12 of the points and authorities prepared by the same deputy city attorney in the court below, it is manifest that he was relying on the incorporation of the funds into the revenue fund and given the multiplicity of funds recited in the two instruments, an understandable transposition of nomenclature occurred.

To bolster its argument that the fees must be refunded, ABI cites section 5.01(c) of the indenture Agreement which it asserts expressly excludes the developer fees and commitment fees from the revenue fund.[8]

ABI misconceives the impact of that section. Properly read, the section merely provides that commitment fees would not be placed into the revenue fund as a matter of first instance. The reference to the Agreement indicates that the fees would be held as therein provided. The Agreement provides in fact that commitment fees would be placed in a special custodial account, to be transferred or refunded as required by the terms of the document. It is clear from that instrument that when the required transfers or refunds have been made, any remaining balance is to be deposited in the revenue fund. There is no disharmony between section 5.01(c) of the indenture and section 7(c) of the Agreement.

## IV. City May Not Retain Developer Fee

The fact that the City was authorized to transfer the fees to the revenue fund to be commingled with other sources of income is not the equivalent of determining that the City was entitled to retain the developer fee. The vitality of the City's position depends on establishing justification in the instruments for *retention* of that fee either as a valid forfeiture or by way of liquidation of damages or as an enforceable loan commitment agreement. These propositions do not appear viable when we construe the indenture and the Agreement in the light of prevailing principles of law.

### A. *No Right to Forfeiture Is Established*

The public policy of the state militates strongly against forfeiture. Civil Codes section 1442 provides: ". . . A condition involving a forfeiture must be strictly interpreted against the party for whose benefit it is created." Both venerable and contemporary authority give full effect to this principle. (*Von Schmidt* v. *Huntington* (1850) 1 Cal. 55, 71; *McNeece* v. *Wood* (1928) 204 Cal. 280, 283-285 [267 P. 867]; *Berardi* v. *General Motors Corp.*

---

[8]Section 5.01(c) provides: "All Revenues shall be deposited by the Trustee upon the receipt thereof in a special fund designated as the "Revenue Fund," which the Trustee shall establish and maintain and hold in trust; *except that* (1) from the first Revenues received after the acquisition of each Home Mortgage an amount equal to the amount of accrued interest paid as part of the purchase price of such Home Mortgage shall be deposited into the Program Fund, (2) *Commitment fees shall be deposited in the Mortgage Reserve Fund or the Redemption Fund as provided in the Agreement,* (3) Home Mortgage Principal Prepayments shall be deposited in the Redemption Fund, and (4) all amounts received pursuant to the Letter of Credit shall be deposited in the Interest Fund, Principal Fund or Redemption Fund, as appropriate. *All Revenues deposited with the Trustee shall be held, disbursed, allocated and applied by the Trustee solely as provided in this Indenture.*" (Italics added.)

(1983) 143 Cal.App.3d Supp. 7, 13 [192 Cal.Rptr. 392].) ▮ In *Cullen* v. *Sprigg* (1890) 83 Cal. 56, 64 [23 P. 222], the court declared: "Contracts and laws declaring a forfeiture must be strictly construed, and a forfeiture can never take place by implication, but must be effected by express, unambiguous language."

▮ Civil Code section 1442 is likewise applicable to contracts with public entities. In *Milovich* v. *City of Los Angeles* (1941) 42 Cal.App.2d 364 [108 P.2d 960], the city sought to enforce a forfeiture clause in a contract to construct a water project. ▮ Relying on Civil Code section 1442, the court stated: "Neither law nor equity looks with favor upon forfeitures and neither will enforce them unless the right thereto is clear and certain. Unless no other interpretation is reasonably possible, a contract should not be construed so as to effect or provide for a forfeiture. . . . If we can reasonably interpret the agreement so as to avoid a forfeiture in view of respondent's conduct, it is our duty so to do." (Pp. 373-374.) Furthermore, the party claiming a forfeiture has the burden of showing that such was the unmistakable intention of the instrument. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771 [158 P.2d 665].)

▮ In attempting to meet its burden of justifying retention of the fees, the City relies heavily upon the fact that there was a reallocation of ABI's unused funds, calling into operation the following language in section 7(b) of the Agreement:[9] ". . . *No portion of any Developer Fee or Developer*

---

[9]Section 7(b) reads as follows: "(b) *Commitment to Purchase Home Mortgage.* Using the moneys in the Program Fund, City and Trustee hereby agree that, until April 1, 1982, Trustee will on behalf of City purchase from the Lending Institutions Home Mortgages in an aggregate principal amount equal as nearly as practicable to the amount of money originally deposited by Trustee into the Program Fund, in the manner and amounts set forth herein, subject to the terms and conditions of the Indenture. Initially, Trustee on behalf of City agrees, to the extent possible, to purchase from each Lending Institution Home Mortgages as set forth on Exhibit D hereto and each Lending Institution agrees to originate and sell to Trustee Home Mortgages as set forth on Exhibit D hereto.

"The Administrator may recommend that the City reallocate funds reserved by a Developer through a Lending Institution on April 1, 1981 if construction on a project has not commenced or is otherwise substantially behind its scheduled completion date *and the City may in its sole discretion, reallocate funds upon recommendation of the Administrator.* Six months after the delivery of the Bonds, Trustee and Administrator shall, in their sole discretion, have the right to reallocate any funds allocated for the purchase of Home Mortgages from a Lending Institution during such six months which have not been used to purchase Home Mortgages or which are not then committed pursuant to Commitment Letters. Furthermore, nine months after delivery of the Bonds, Trustee and Administrator may reallocate, in their sole discretion, all monies previously allocated for the purchase of Home Mortgages from a Lending Institution during such time which have not been used to purchase Home Mortgages or which are not committed pursuant to Commitment Letters. In connection with any such reallocation, and at such other times as Trustee or Administrator may reasonably request, each Lending Institution agrees to provide upon 5 days written notice, copies of all Commitment Letters issued by such Lending Institution, together with a statement of the total principal amount of Home Mortgages committed thereby. No portion of

*Commitment Fee*[10] *shall be reduced or returned as a result of such reallocation.* A Lending Institution receiving a reduced amount of Home Mortgage funds as a result of such reallocation shall be entitled to a refund of a portion of its Commitment Fee equal to 1% of the reduction . . . (if . . .) . . . no suitable substitute newly constructed Homes can be found for the Program . . . ." (Italics added.)

In discharging our duty to avoid a forfeiture where reasonably possible, we perceive that this language is too inconclusive and ambiguous to show that it was the unmistakable intention of the parties to signify that the drastic remedy of forfeiture should follow upon transfer of the fees to the revenue fund. No provision expressly or impliedly states that the fees are to be forfeited or are to be retained by the City after transfer. Given the notable absence of classic indicia—express statements that the fees are to be forfeited to, or retained by, the City after transfer—the language is reasonably susceptible of the construction that a reallocation does not, per se, actuate an entitlement to a refund by the developer. The words employed may plausibly be construed to mean that because the developer has not earned a return of his fees by selling homes, and his nonperformance may constitute a breach of contract that may have caused actual damage to the City, the fees are not returned but remain available to compensate the City for any injury sustained as a result of a developer's nonperformance. This might include any special expenses incurred by the City in finding developers for the reallocated funds. That for the purposes of convenience to the City, the fees are permitted to be transferred to the revenue fund is a far cry from establishing an unmistakable intent to work a forfeiture. The draftsman of the Agreement on behalf of the City could easily have used language expressing its unequivocal intention to effectuate a forfeiture.[11]

---

any Developer Fee or Developer Commitment Fee shall be reduced or returned as a result of such reallocation. A Lending Institution receiving a reduced amount of Home Mortgage funds as a result of such reallocation shall be entitled to a refund of a portion of its Commitment Fee equal to 1% of the reduction to the extent that such reduction results from the failure of a Developer to deliver Homes in a timely fashion to a Lending Institution as set forth on Exhibit D hereto and, after good faith and diligent effort by the City, the Administrator and such Lending Institution, no suitable substitute newly constructed Homes can be found for the Program and no qualified newly-originated Home Mortgages on Existing Homes are available for purchase by Trustee. Administrator may require an additional Commitment Fee or Developer Fee or Developer Commitment Fee from any Lending Institution or Developer receiving an increased amount of Home Mortgage funds."

[10]The 1 percent developer commitment fee is by definition nonrefundable (see fn. 1).

[11]We note in passing, as a matter of academic interest only, that in documents used in the 1982 program concerning a fee named the developer performance fee, the City's draftsmen were able to state forthrightly that in the event of a reallocation, ". . . City . . . shall be entitled to retain . . . any Developer Performance Fee paid by the affected Developer notwithstanding that City may later secure a similar fee or fees from another Developer for the Developer's Allocation so reallocated . . . ."

Internal evidence in section 7(b) further reinforces our construction against forfeiture. It is provided therein that the administrator of the program may recommend that the City reallocate funds reserved by a developer if construction on a project has not commenced or is otherwise substantially behind its scheduled completion date and that the City may in its sole discretion reallocate funds upon such recommendation. To adopt unqualifiedly the City's contention that the language here in question, namely "[n]o portion of any Developer Fee . . . shall be reduced or returned as a result of such reallocation," would lead to the result that a forfeiture could be accomplished upon reallocation even if the operative cause of the underlying delay in performance were attributed to the fault of the City.[12] To countenance such an oppressive result would subvert the principle embodied in Civil Code section 1442.

City points out that section 7(b) of the Agreement treats the developer fee and the lender's commitment fee differently in that it specifically provides that in the event of reallocation, due to the developer's failure to deliver homes in a timely fashion, the lender's commitment fee will be returned to the lending institution unless the City can find a suitable substitution. This circumstance does not, however, compel the implication that the developer fee which is not refunded by the fact of reallocation, by itself, is consequently forfeited. The Agreement is devoid of such impelling language, and as has been shown, it is reasonably possible to interpret the Agreement to avoid a forfeiture. ▉ The law stringently disfavors forfeitures by implication. (*Cullen* v. *Sprigg, supra,* 83 Cal. 56, 64.) ▉ This stricture is applicable to the case at hand, and particularly so where a forfeiture might occur without culpability on the part of the developer or by the conduct of the party claiming forfeiture.

In the instant case, the City failed to produce any evidence of actual damage.

B. *City Is Not Entitled to Retain the Developer Fee as Constituting Either Liquidated Damages or as a Charge for a Commitment Fee*

▉ City asserts the court erred in not permitting it to retain the developer fee as liquidated damages. The threshold impediment to City's argument is that there is no effective provision in the Agreement which adequately provides a basis for liquidated damages.

Departing radically from the former law, on July 1, 1978, the Legislature repealed Civil Code section 1670, and amended section 1671 in order to

---

[12]The uncontradicted evidence strongly establishes that the City in fact contributed to the events which resulted in the reallocation.

express a new policy favoring the enforcement of liquidated damage provisions except against the consumer in a consumer case. (Civ. Code, § 1671, subds. (b) and (c); see Cal. Law Revision Com. comment on § 1671, subd. (b).) In pertinent part, subdivision (b) of Civil Code section 1671 now provides that ". . . a *provision* in a contract liquidating the damages for the breach of a contract is valid unless the parties seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made." (Italics added.) ■ It is apparent that the *sine qua non* for this favorable treatment to operate is a requirement that the contract contain a meaningful provision for liquidated damages, which normally stipulates a pre-estimate of damages in order that the parties may know with reasonable certainty the extent of liability for a breach of their contract. (*Better Food Mkts.* v. *Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179, 184 [253 P.2d 10, 42 A.L.R.2d 580].) ■ Liquidated damages constitute a sum which a contracting party agrees to pay or a deposit which he agrees to forfeit for *breach of some contractual obligation.* (McCormick, Damages (1935) § 146, p. 599.) ■ The Agreement herein is barren of an expression of this indispensable ingredient. If the City wanted to claim the developer fee as liquidated damages, upon reallocation, it should have written the instrument to say so in a manner which would clearly express this intention. The language used is far from purporting to be a preestimate of damages for breach of contract, particularly since it is possible for the conditions causing reallocation to be without fault on the part of the developer.[13] These deficiencies manifest that the language in question cannot effectively qualify as a provision for the liquidation of damages. To give it such a designation would constitute a trap for the unwary.

■ City additionally insists that it has the right to retain the developer fee by analogy to a miscellany of cases which stand for the generalized proposition that a provision in a loan commitment agreement which authorizes the lender to charge the borrower a standby fee, a commitment fee, or some similar deposit for holding himself in readiness to make the loan is enforceable notwithstanding the borrower's failure to draw upon the funds or to proceed with the transaction. The concept that loan commitment fees of this nature between a lender and a borrower have become "a financial fact of life" and are enforceable under a wide spectrum of legal theories, such as liquidated damages, valid forfeiture, bargained-for consideration, an option, or otherwise, is exhaustively explored in an Annotation at 93 American Law Reports, Third Series (1979) page 1156, 1176. It is also the law in California. (*Lowe* v. *Massachusetts Mut. Life Ins. Co.* (1976) 54 Cal.App.3d 718 [127 Cal.Rptr. 23].)

---

[13]See footnote 12

Assuming that by analogy, those lender-borrower cases might be equated with the 1980 Home Mortgage Revenue Bond Program, the City's contention remains untenable. We have already concluded in our discussion of liquidated damages that the operative language of section 7(b) precludes a construction which authorizes the City to retain the developer fee solely because it has authorized reallocation of funds, because of the Agreement's equivocal and uncertain language and because of the possibility of liability without fault. By a parity of reasoning, the ambiguity is not dispelled by the City's attempt to convert such language into an understanding that ABI was to pay a standby fee for a loan commitment and that such fee was nonrefundable regardless of fault. Its language is singularly inapt for such purpose. The indenture and Agreement were prepared without any input from ABI. We resolve the ambiguity against the party whose counsel prepared it and adopt the reasonable construction more favorable to ABI in the non borrower-lender context before us. (See *Steeve v. Yaeger* (1956) 145 Cal.App.2d 455, 463 [302 P.2d 704].)

V. THE COURT ERRED IN RETURNING THE LENDER'S COMMITMENT FEE TO ABI

ABI and its lender Coast entered into a private agreement to which the City was not a party which required, among other obligations, that ABI pay to Coast a 1 percent lender's commitment fee (ultimately in the amount of $8,030) which is payable to the City. The ABI-Coast agreement declared: "Any portion of the 1% of Lenders Commitment Fee advanced by the Developer and subsequently returned to Coast Federal Savings by the City of Los Angeles shall be returned to the Developer." The only fee directly paid by ABI to City were the developer commitment fee and the developer fee. The lender's commitment fee, although paid by ABI to Coast, was received by the City from Coast.[14] Since the City was not in privity to the contract between ABI and Coast, and there is no evidence that the City was aware

---

[14]The pertinent part of the ABI-Coast agreement is as follows: "3. *Required Program and Commitment Fees*: A non-refundable commitment fee of 1% of $803,000.00 or of the dollar balance of mortgages reserved by your organization under the bond program. In addition, your organization shall be required to pay to Coast Federal Savings a 1/10 of 1% Lenders Application fee, and a 1% Lenders Commitment fee of the dollar balances reserved by your organization under the bond program which are payable to the City of Los Angeles. All fees are payable upon execution of this commitment. The 1% Lenders Commitment fee shall be refunded to your organization in the following manner. One percent (1%) of the balance of mortgages funded under this commitment by Coast Federal Savings and sold to the Trustee under the bond program shall be refunded to developer. In the event the 1980 Home Mortgage Revenue Bond program is not consummated by 12/31/80, all fees paid to Coast Federal Savings shall be returned to developer when they are returned to Coast Federal Savings by the City of Los Angeles. Any portion of the 1% Lenders Commitment fee advanced by developer and subsequently returned to Coast Federal Savings by the City of Los Angeles shall be returned to developer."

of such arrangement, we are required to deal with the matter of the treatment of the lender's commitment fee as prescribed in the Agreement.

The only obligation undertaken by the City in the Agreement was to refund the loan commitment fee to *Coast* in the event of reallocation of ABI's funds and then only if no suitable substitute homes could be found for the program. We will assume that Coast was entitled to a refund, although the actual fact may be to the contrary.[15] Under such circumstances, ABI might be regarded as a creditor of Coast to the extent that it advanced the lender's commitment fee. However, such status alone would not give ABI a right to recover on the Agreement between Coast and City for return of the lender's commitment fee. ▮ In order for ABI to have standing to sue under this type of a creditor-beneficiary contract, it must appear that (1) the debtor (Coast) intended thereby to discharge its debt to the beneficiary (ABI) (*Hartman Ranch Co.* v. *Associated Oil Co.* (1937) 10 Cal.2d 232, 245 [73 P.2d 1163]), and (2) that the promisor (City) must have understood that the promisee (Coast) had such an intent. (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685].) ▮ This benefit which Coast promised to confer on ABI was never mentioned in the Agreement but appears only in their private contract. It is clear that the Agreement was a standardized contract applicable to all lenders, regardless of private arrangements any lenders might have made with their own developers and there is not a scintilla of evidence that the City had any knowledge of Coast's arrangement with ABI. ▮ ▮ ▮ As a matter of law,[16] ABI is not entitled to proceed against City for a refund of the loan commitment fee despite any rights or equities that ABI may have against Coast under their special contract.

### VI. ▮ THE WRIT OF MANDATE WAS PROPERLY DENIED

ABI has appealed from denial of the writ of mandate. In so ruling, the trial court relied on *Wenzler* v. *Municipal Court* (1965) 235 Cal.App.2d 128 [45 Cal.Rptr. 54] which states the controlling law as follows: "As a

---

[15]The evidence shows that following the reallocation, all 1980 bond proceeds were successfully applied to the purchase of qualified home mortgages. However, we do not know whether Coast remained as a lender after reallocation. The only specific reference to the matter appears on page 10, lines 2 and 3, of the City's points and authorities in support of its answer to the petition for writ of mandate, where it is stated: ". . . a reallocation was made to other developments. The lender remained Coast Federal." If that were so, ABI's claim upon the City would be even more attenuated, since there would be no source of funds for payment. (See *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 868 [44 CAI.Rptr. 767, 402 P.2d 839].) However, the points and authorities were not received in evidence.

[16]A change of theory is permitted on appeal where the facts presented raise a pure question of law. (*Ward* v. *Taggart* (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; see *Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861, 865.)

general proposition, mandamus is not an appropriate remedy for enforcing a contractual obligation against a public entity for at least two reasons. The first is that contracts are ordinarily enforceable by civil actions, and the writ of mandamus is not available unless the remedy by civil action is inadequate. [Citations.] The other is that the duty which the writ of mandamus enforces is not the contractual duty of the entity, but the official duty of the respondent officer or board." (P. 132.) This general rule applies to this case, the remedy at law being adequate. The case of *May* v. *Board of Directors* (1949) 34 Cal.2d 125 [208 P.2d 661] is not to the contrary. An exception relaxes the general rule in cases involving a dispute as to the proper interpretation of a statute defining the exercise of official duty even though the ultimate effect of a decision may be to adjudicate a monetary claim. The *May* case falls within the ambit of the exception.

## VII. Disposition

The judgment is modified by reducing the amount ordered in favor of ABI from $38,698 to $30,168. As so modified, the judgment is affirmed. Each side to bear their own costs on appeal.

Feinerman, P. J., and Ashby, J., concurred.