[No. H013638. Sixth Dist. Sept. 25, 1997.]

CALIFORNIANS FOR POPULATION STABILIZATION, Plaintiff and Appellant, v.
HEWLETT-PACKARD COMPANY, Defendant and Respondent.

[No. H014028. Sixth Dist. Sept. 25, 1997.]

CALIFORNIANS FOR POPULATION STABILIZATION, Plaintiff and Appellant, v.
TATA SONS LIMITED et al., Defendants and Respondents.

[No. H014384. Sixth Dist. Sept. 25, 1997.]

CALIFORNIANS FOR POPULATION STABILIZATION, Plaintiff and Respondent, v.
TATA SONS LIMITED et al., Defendants and Appellants.

278

COUNSEL

Mary T. Dumont, Michael J. Lowy, James Danaher, Jr., Kathleen S. Rogers, Severson & Werson and William L. Stern for Plaintiff and Appellant and for Plaintiff and Respondent.

Kelley, Drye & Warren, Paul L. Bressan, Cynthia S. Papsdorf, Fenwick & West, Patricia M. Lucas, Gibson, Dunn & Crutcher, Dennis A. Gladwell and Susan B. Burr for Defendants and Appellants and for Defendants and Respondents Tata Sons Limited et al.

OPINION

MIHARA, J.—Plaintiff Californians for Population Stabilization (CAPS) appeals from judgments in favor of defendants Tata Sons Limited and its division Tata Consultancy Services (collectively Tata) and Hewlett-Packard

Company (H-P). Tata appeals from an order denying its motion for attorney's fees.[1] For the reasons stated below, we affirm both judgments and the post-judgment order.

## PROCEDURAL HISTORY

On October 4, 1993, CAPS filed a complaint for a preliminary and permanent injunction under Business and Professions Code[2] section 17200. The first cause of action alleged Tata had committed acts of unfair competition by engaging in statutorily prohibited conduct and unfair practices. The second cause of action alleged that H-P was aware of Tata's unlawful and unfair business practices and was liable for conspiring with Tata to violate California law.

After three amended complaints were filed, H-P's motion for summary judgment was granted by the court. The court found CAPS had failed to raise a triable issue of material fact as to H-P's knowledge of or participation in the alleged unlawful practices. The remaining action proceeded to a nonjury trial, after which the court rendered a 30-page statement of decision. Judgment was entered in favor of Tata, but the company's motion for attorney's fees was denied. Notices of appeal were timely filed.

On December 6, 1995, CAPS moved to dismiss Tata's appeal from the order denying its motion for attorney's fees on the grounds that Tata had failed to comply with section 17209. In response, Tata moved to dismiss CAPS's underlying appeal for violation of the same statute. This court deferred consideration of both motions. Thereafter, this court granted a request by the California District Attorneys Association for leave to file an amicus curiae brief.

## FACTS[3]

Based in India, Tata employs approximately 4,000 computer engineers who work in India and around the world. The company has 35 offices

---

[1]Tata's motion to consolidate the three appeals was initially denied by this court. After further review of the three records, we now believe consolidation is proper and, in the interest of judicial economy, consolidate the appeals on our own motion.

[2]All further statutory references are to the Business and Professions Code unless otherwise indicated.

[3]CAPS claims it does not challenge the sufficiency of the evidence or the facts as found by the court. Accordingly, our statement of facts is based in most part on a more complete version of the trial court's statement of decision than presented by CAPS in its opening brief. The statement of facts in the CAPS opening brief is based on a skewed selection of specific findings contained in the court's decision.

worldwide, 10 of which are in the United States. Tata provides extensive training to its newly recruited computer engineers which lasts for 12 to 18 months, depending on the individual trainee.

Commencing in October 1989, Tata entered into contracts to supply software engineers, systems analysts, and computer programmers to assist on projects of and/or design and develop software for companies in California. These included H-P, Oracle Corporation, IBM and American President Lines.

If Tata is awarded a California contract, it identifies possible candidates to fill the project from its employees. Some of the work done by Tata computer engineers is done in California at the client's site. Tata refers to these overseas assignments as "deputations." The United States deputations are for terms of up to two years. One of Tata's clients, H-P, reserved the right to approve any consultant proposed by Tata.

Tata pays its deputed workers both salary and expenses while they work in California, in addition to the salary and benefits the company continues to provide to them in India. The current Indian salary component paid to workers on deputation ranges up to 170,000 rupees per year, or $5,600 per year at current exchange rates. The difference between the remuneration received by Tata employees while in India versus the United States is that Tata pays workers on deputation a cash housing and living allowance to make up for the higher cost of living in the United States.

Prior to 1993, some Tata workers came to the United States by way of "B-1" visas. Federal law concerning B-1 visas prohibited Tata from paying a United States salary to those workers during their deputations. During those deputations, Tata continued to pay those workers on B-1 visas the same Indian salary and benefits they would have received if they continued to work in India. In addition, the B-1 deputees were paid an amount in cash that Tata believed would compensate for housing and general living expenses. Deputees now receive H-1B visas.

Tata computer engineers currently on deputation in California receive total gross compensation of between $28,500 and $38,500. They continue to receive their Indian salary of 85,000 to 170,000 rupees per year, which is among the highest salaries paid by comparable Indian companies to employees with similar backgrounds and experience. In addition to their Indian

salary and benefits,[4] Tata pays the computer engineers in California additional compensation in the net amount of $1,800 to $2,200 per month, exclusive of taxes. Tata also pays on behalf of the computer engineers, state and federal income taxes on the United States compensation, FICA (Federal Insurance Contributions Act), FUTA (Federal Unemployment Tax Act), and unemployment tax, the total of which is equivalent to 30 percent or more of the net compensation.

Tata customarily charges its clients $5,000 per month, or $60,000 per year, for each employee. These same clients pay on the average up to $110,000 per year, inclusive of salary and benefits, for comparable non-Tata programmers.

After a Tata employee agrees to go on an overseas deputation, he or she is required to sign documents in India. The first document is the "Deputation Letter," which confirms, among other things, the amount of compensation he or she will receive. The second is the deputation agreement, which memorializes the employee's commitment to complete the project to which he or she is assigned and to return to India to work for Tata for the applicable postdeputation period. In addition, the employee signs the affidavit and undertaking that is provided to the United States Consul with the visa application, and the nonimmigration agreement. The nonimmigration agreement states that the employee will neither seek permanent immigration status nor accept employment with another employer.

Prior to March 1991, and thereafter, the deputation agreement provided for liquidated damages, expressed in rupees, in the event of certain breaches including the following: 1) the employee quits before the end of the term of the United States deputation; 2) the employee fails to return to work for Tata in India, for the "compulsory employment" period of double the term of the United States deputation, up to a maximum of two years; 3) Tata terminates the deputation before the completion of the project; 4) Tata terminates the employee during the postdeputation "compulsory employment" period in India; 5) the employee works for a Tata competitor anywhere in the world; or 6) the employee changes sponsoring employers.

In March 1991, Tata expanded the liquidated damages clause in the deputation agreement. It provides that if the breach occurs while the employee is in the United States, Tata may recover from the employee $30,000

---

[4]Indian benefits include a housing subsidy of up to 25 percent of the Indian salary, a "Provident Fund" similar to a retirement fund into which Tata pays an amount equal to 10 percent of the Indian salary, and a "Superannuation Fund" not tied to retirement into which Tata pays 15 percent of the engineer's salary. The Indian salary earned by Tata employees while in the United States on deputation is paid by direct deposit into their Indian bank accounts.

in liquidated damages as well as a "debt" in the amount of salary and allowances paid, and interest on the liquidated sums of 9 percent per year. The amount of the "debt" Tata recovers is determined in an Indian arbitration proceeding.

The Tata employees are also required to sign an estoppel certificate and nonimmigration covenant that contains the following language: "I shall not accept any employment of assignment with any Tata Consultancy Services client who has been introduced to me during the deputation or any employment by any competitor of Tata Consultancy Services or any other employer in the U. S. A. If I violate this agreement, Tata Consultancy Services is entitled to recover liquidated damages in the sum of $30,000 and seek injunctive relief in a court of law."

The parties stipulated that "[i]f Indian Law were to apply to the employment relationships, contractual provisions, acts and practices complained of by CAPS, they would be lawful under Indian law."

Despite these written agreements, approximately 30 computer engineers have abandoned their California deputation projects before completion. Because of the substantial adverse impact of these breaches on the particular projects (particularly with respect to "time to market" constraints), the affected Tata clients—H-P, Oracle and IBM—complained to Tata in writing and during meetings with Tata representatives. They threatened to take future business away from Tata unless the company could do something to prevent these abandonments. Tata in fact lost business from H-P and Oracle as a result of the Tata computer engineers abandoning their projects.

On various occasions, Tata representatives met with representatives of H-P to explore solutions to the problem. Among other things, they discussed litigation Tata had commenced to enforce the $30,000 liquidated damages provision against the breaching engineers.

Based on these facts, and others to be addressed in our discussion, the trial court concluded CAPS had failed to meet its burden of proving an unlawful, unfair or fraudulent business practice by Tata.

## DISCUSSION

### I

### *Section 17209*

Enacted in 1992, section 17209 provides as follows: "If a violation of this chapter is alleged or the application or construction of this chapter is in issue

in any proceeding in the Supreme Court of California, a state court of appeal, or the appellate department of a superior court, the person who commenced that proceeding shall serve notice thereof, including a copy of the person's brief or petition and brief, on the Attorney General, directed to the attention of the Consumer Law Section, and on the district attorney of the county in which the lower court action or proceeding was originally filed. The notice, including the brief or petition and brief, shall be served within three days after the commencement of the appellate proceeding, provided that the time may be extended by the Chief Justice or presiding justice or judge for good cause shown. No judgment or relief, temporary or permanent, shall be granted until proof of service of this notice is filed with the court." (See Stats. 1992, ch. 385, § 2.)

■■■ CAPS takes the position that the statute establishes a jurisdictional requirement for all appellate actions involving unfair competition. That is, unless an appellant who challenges a trial court's decision involving a violation of section 17200 et seq. serves notice of the appeal on the Attorney General and the district attorney of the county in which the lower court action or proceeding was originally filed within three days after the commencement of the appellate proceeding, the appellate court lacks jurisdiction to hear the appeal.[5] In response, Tata argues that if the CAPS position is correct, the appeal by CAPS in the underlying action should be dismissed, since CAPS failed to serve the Attorney General or the Santa Clara District Attorney with its opening brief within three days after the commencement of the appellate proceeding. In its amicus curaie brief, the California District Attorneys Association asserts section 17209 establishes a jurisdictional requirement and applies to both parties' appeals. However, it maintains that service of briefs is only required within three days after filing the briefs in an appellate court. These divergent views emphasize the deficiency of the statute.

■■■ " 'Our analysis starts from the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. . . . In determining intent, we look first to the words themselves. . . . When the language is clear and unambiguous, there is no need for construction. . . .' . . . [¶] 'But the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute

[5]In the instant action, Tata did not serve its notice of appeal challenging the trial court's denial of its motion for attorney's fees on the Attorney General or the Santa Clara District Attorney by August 31, 1995, within three days after filing its notice of appeal. Rather, it served its opening brief on these authorities on November 14, 1995, 78 days after commencement of the appellate proceeding.

comports with its purpose . . . .' . . . 'Of course, " ' "language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." ' ". . .' . . . 'Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. . . . An interpretation that renders related provisions nugatory must be avoided. . . ; each sentence must be read not in isolation but in the light of the statutory scheme. . . ; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed . . . .' " (*Ream* v. *Superior Court* (1996) 48 Cal.App.4th 1812, 1817-1818 [56 Cal.Rptr.2d 550], citations omitted.)

 At the outset we note the statute makes no mention of jurisdiction. Where, as here, there is no suggestion that the Legislature intended to strip the court of jurisdiction because of noncompliance with statutory service of process, the language of the statute should be directory rather than mandatory. (See, e.g., *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1419 [286 Cal.Rptr. 239].) "The strong public policy in favor of hearing appeals on the merits operates against depriving an aggrieved party or attorney of a right to appeal because of noncompliance with technical requirements. [Citations.]" (*Moyal* v. *Lanphear* (1989) 208 Cal.App.3d 491, 497 [256 Cal.Rptr. 296]; see also *Department of Industrial Relations* v. *Nielsen Construction Co.* (1996) 51 Cal.App.4th 1016, 1023-1024 [59 Cal.Rptr.2d 785].) Accordingly, we hold the statute is not jurisdictional.

As is obvious to any person familiar with appellate procedure, compliance with the statute, if read literally, is impossible. That is, it requires an appellant to serve its opening brief on the Attorney General and local district attorney prior to the time the appellate record can be prepared. Accordingly, we look to the legislative intent in enacting the statute.

The Assembly Subcommittee on the Administration of Justice, which considered Senate Bill No. 1911, the bill enacting section 17209, described the existing problem and the legislative solution: "Unfortunately, it has been the experience of various public prosecutors, who bring the majority of actions under the above-identified laws [section 17200 et seq.], that a disconcerting number of actions brought by private parties are not well-researched or well-litigated. Too frequently, in privately litigated cases, the appellate courts of this state have published opinions that involve 'bad law' because the private litigants lack the expertise possessed by various public

prosecutors. On many occasions, public prosecutors learn of these adverse outcomes upon publication. Significant time and energy is then expended to modify, or depublish, these decisions. [¶] SB 1911 is designed to prevent this problem from recurring. In the future, district attorneys and the Attorney General will be informed of pending appeals at the outset and may seek permission to participate as *amici*, or otherwise influence the prosecution of the appeal."

If the purpose of the statute is to inform the Attorney General and the local district attorney of issues to be raised on appeal, we see little point in requiring that these persons be served with the notice of appeal within three days of its filing. California Rules of Court, rule 1 requires that a notice of appeal be liberally construed in favor of sufficiency. The notice, if signed by the appellant or his or her attorney, "shall be sufficient if it states in substance that the appellant appeals from a specified judgment or a particular part of the judgment." Thus, receipt of a notice of appeal provides the Attorney General and local district attorney no useful information. There is no requirement that the notice state it is an appeal from a unfair competition action, let alone set forth the issues to be raised on appeal.

We believe a more reasonable interpretation of the statute is that the Attorney General and local district attorney must be served with the appellant's opening brief within three days of its being filed. It is not until this point that the issues on appeal are specifically set forth, and a determination may be made whether to file an amicus curiae brief.[6] If the Attorney General and/or the local district attorney are not served with the opening briefs within three days of their being filed, and if time for serving the brief has not been extended for good cause shown, no judgment or relief may be granted by the court.

In the present case, the opening briefs were timely served on the Attorney General and the Santa Clara District Attorney. Accordingly, both motions to dismiss are denied.

---

[6]It is interesting to note that the Attorney General and the Santa Clara District Attorney were served with CAPS's and Tata's motion to dismiss on December 6, 1995, and January 18, 1996, respectively. They were served with Tata's opening brief on November 14, 1995, and with CAPS's opening brief on March 15, 1996. Nevertheless, the California District Attorneys Association waited until April 23, 1997, more than one year after opening briefs had been filed, to request permission to file an amicus curiae brief in this case.

## II

*Appeal No. H014028*

In this appeal CAPS contends the trial court erred in finding Tata had not violated section 17200. We reject the contention.

### Standard of Review

The applicable standard of review is disputed by the parties. CAPS contends the standard is de novo; Tata argues the substantial evidence test should be employed. It is settled that what constitutes "unfair competition" or "unfair or fraudulent business practice" under any given set of circumstances is a question of fact. (*People* v. *McKale* (1979) 25 Cal.3d 626, 635 [159 Cal.Rptr. 811, 602 P.2d 731].) That is, ". . . the determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." (*Motors, Inc.* v. *Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [162 Cal.Rptr. 543].) However, where, as here, there is no dispute or conflict in the evidence, the finding of the trial court that the defendant's conduct is not in violation of section 17200 amounts to a conclusion of law. (*State Bd. of Funeral Directors* v. *Mortuary in Westminster Memorial Park* (1969) 271 Cal.App.2d 638, 642 [76 Cal.Rptr. 832].) Such conclusions of law are reviewed de novo. (*Freeman* v. *Time, Inc.* (9th Cir. 1995) 68 F.3d 285, 288.)

### Liquidated Damage Clause

Section 17200 defines "unfair competition" as "any unlawful, unfair or fraudulent business act or practice . . . ." The unlawful business activity proscribed by the statute consists of any type of business practice that, at the same time, is forbidden by law. (*Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730].) In essence, an action based on section 17200 to redress unlawful business practices "borrows" violations of other laws and treats them as unlawful practices independently actionable under section 17200. (2 Cal.4th at p. 383; *Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 839 [33 Cal.Rptr.2d 438].)

■ CAPS first contends the $30,000 liquidated damages provision contained in the Tata employment agreements violates section 16600[7] as well as Civil Code sections 1670.5[8] and 1671.[9] Citing *People* v. *McKale, supra,* 25 Cal.3d at page 635, it maintains the inclusion of unlawful terms in a form contract constitutes "unfair competition" and violates section 17200.

■ At the outset we note that most reported cases involving unlawful business practices have been predicated on state law violations. Laws that have been enforced under section 17200's "unlawful" prong include antidiscrimination laws (*Consumers Union of United States, Inc.* v. *Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1444 [257 Cal.Rptr. 151]); antitrust laws (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1348 [235 Cal.Rptr. 228]); criminal laws (*People* v. *E.W.A.P.*, *Inc.* (1980) 106 Cal.App.3d 315, 318 [165 Cal.Rptr. 73]); environmental protection laws (*People* v. *K. Sakai Co.* (1976) 56 Cal.App.3d 531 [128 Cal.Rptr. 536]); fish and game laws (*People* ex rel. *Van de Kamp* v. *Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 759 [251 Cal.Rptr. 657]); housing laws (*Hernandez* v. *Stabach* (1983) 145 Cal.App.3d 309, 314-315 [193 Cal.Rptr. 350]); labor laws (*People* v. *Los Angeles Palm, Inc.* (1981) 121 Cal.App.3d 25, 32-33 [175 Cal.Rptr. 257]); and vehicle laws (*People* v. *James* (1981) 122 Cal.App.3d 25, 35-36 [177 Cal.Rptr. 110]). It is questionable whether the three statutes cited by CAPS actually constitute violations of law as contemplated by section 17200. Rather, they appear to address certain unenforceable contract provisions which may be severed from a contract. There is merit to Tata's claim that section 17200 "does not give the courts a general license to review the fairness of contracts but rather has been used to enjoin deceptive or sharp practices." (*Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1299, fn. 6 [22 Cal.Rptr.2d 20].) Nevertheless, we address each statute in turn.

■ In 1977, the Legislature revised Civil Code section 1671, so as to replace the former policy of presumptive invalidity of liquidated damages

[7]Section 16600 provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." CAPS maintains the language in the estoppel certificate and nonimmigration covenant violates the statute.

[8]In relevant part Civil Code section 1670.5 provides that "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

[9]Civil Code section 1671 states in relevant part that ". . . a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."

clauses (see *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 734, fn. 1 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39], quoting former Civ. Code, § 1670) with a policy of presumptive validity. (*O'Connor* v. *Televideo System, Inc.* (1990) 218 Cal.App.3d 709, 718 [267 Cal.Rptr. 237]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 528, 530, pp. 470, 471; Cal. Law Revision Com. com., 9 West's Ann. Civ. Code, § 1671 (1985) pp. 497-498.) Among the reasons favoring such provisions is reduction of litigation. (1 Witkin, Summary of Cal. Law, *supra*, at p. 470.)

Civil Code section 1671, subdivision (b) states a presumption of validity of a liquidated damages clause, and places the burden on the party who seeks invalidation to show that "the provision was unreasonable under the circumstances existing at the time the contract was made." "Unlike subdivision (d), subdivision (b) gives the parties considerable leeway in determining the damages for breach. All the circumstances existing at the time of the making of the contract are considered, including the relationship that the damages provided in the contract bear to the range of harm that reasonably could be anticipated at the time of the making of the contract." (Cal. Law Revision Com. com., 9 West's Ann. Civ. Code, *supra*, § 1671, p. 498.)

Citing *Hitz* v. *First Interstate Bank* (1995) 38 Cal.App.4th 274 [44 Cal.Rptr.2d 890], *ABI, Inc.* v. *City of Los Angeles* (1984) 153 Cal.App.3d 669 [200 Cal.Rptr. 563], and *Better Food Mkts.* v. *Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179 [253 P.2d 10, 42 A.L.R.2d 580], CAPS contends Tata made no damages calculation in fixing liquidated damages at $30,000; it arrived at this amount as a measure of what it would take to keep deputed employees on the job.

Unlike the instant action, *Hitz* and *Better Food Mkts.* pertain to liquidated damages provisions in consumer contracts. Such liquidated damages provisions fall under Civil Code section 1671, subdivision (d), where a different standard for evaluating the validity of the provisions applies.

In *ABI*, the court, in describing the present version of Civil Code section 1671, subdivision (b), stated: ". . . it is apparent that the *sine qua non* for this favorable treatment to operate is a requirement that the contract contain a meaningful provision for liquidated damages, which *normally* stipulates a pre-estimate of damages in order that the parties may know with reasonable certainty the extent of liability for a breach of their contract." (*ABI, Inc.* v. *City of Los Angeles, supra*, 153 Cal.App.3d at p. 685, italics added.) The decision does not hold that a preestimate is mandatory.

There is also no merit to the claim that the liquidated damages provision was designed to keep the employee at the job. A liquidated damages provision is not invalid merely because it is intended to encourage a party to perform, so long as it represents a reasonable attempt to anticipate the losses to be suffered. (See 1 Witkin, Summary of Cal. Law, *supra*, Contracts, p. 470.)

CAPS relies on *Howard* v. *Babcock* (1993) 6 Cal.4th 409 [25 Cal.Rptr.2d 80, 863 P.2d 150, 28 A.L.R.5th 811], for the claim that Tata failed to make a reasonable endeavor to negotiate the liquidated damages with its employees. In that case, the partners who withdrew from a law firm brought an action against the remaining partners for accounting, damages, and declaration of rights under partnership agreement. The Supreme Court granted review to decide whether an agreement between law partners is enforceable if it requires withdrawing partners to forego certain contractual withdrawal benefits if they compete with their former law firm. In concluding that the agreement was enforceable, the high court stated at page 425: "As we have said with respect to liquidated damage clauses, 'a contractual provision specifying damages for breach [of contract] is valid only if it "represent[s] the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." ' " The court quotes *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 930-931 [216 Cal.Rptr. 345, 702 P.2d 503], which in turn quotes *Better Food Mkts*. v. *Amer. Dist. Teleg. Co.*, *supra*, 40 Cal.2d at p. 187. As previously stated, *Better Foods* deals with consumer contracts. Moreover, it was decided prior to the 1977 statutory change of presumptions for liquidated damages.

*Howard* does not hold that Civil Code section 1671, subdivision (b) requires employers to negotiate a liquidated damages provision with its employees. While it is true that a standardized employment contract, like any preprinted agreement, does not present a realistic opportunity to negotiate the liquidated damages provision of the contract, that in itself does not make the provision unreasonable. (*H. S. Perlin Co.* v. *Morse Signal Devices* (1989) 209 Cal.App.3d 1289, 1299 [258 Cal.Rptr. 1].) Indeed, even CAPS's cited authority holds that negotiation is not required. In *Feary* v. *Aaron Burglar Alarm, Inc.* (1973) 32 Cal.App.3d 553, 557-558 [108 Cal.Rptr. 242], the court rejected the claim that a liquidated damages provision was invalid because it was part of a form contract.

Given the current statutory policy which favors the validity of liquidated damages agreements except in certain consumer transactions, and which

casts the burden on the opposing party to prove unreasonableness, the trial court correctly determined that Tata's use of the liquidated damages clause did not constitute an unfair business practice. While we agree with CAPS that the trial court erroneously relied in part on *Payne* v. *United California Bank* (1972) 23 Cal.App.3d 850 [100 Cal.Rptr. 672], there is no evidence that CAPS rebutted the presumed validity of the liquidated damages provisions in this case.

We also reject CAPS's contention that the liquidated damages provisions were unconscionable and in violation of Civil Code section 1670.5. Where, as here, a liquidated damages clause meets the requirements imposed by Civil Code section 1671, no claim can be made that the provision is nonetheless unconscionable. (*H. S. Perlin Co.* v. *Morse Signal Devices*, *supra*, 209 Cal.App.3d at p. 1302.)

*Statutory Violations*

Paragraph 9 of Tata's deputation agreement provides in pertinent part: "It is hereby agreed by and between the parties that all sums advanced or to be advanced thereafter or paid to the Employee or expended on his/her behalf or on his/her account under the provisions of this agreement and any other expenses lawfully incurred by the Employer in connection with the deputation of the Employee as aforesaid together with an amount equivalent to the sum payable to payable to the Employee as salary with all allowances during the period of deputation . . . and amounts specified in Article 11 payable as liquidated damages shall constitute a debt owing to the to the Employer and shall be recoverable by the Employer from the Employee and Surety jointly and severally with interest thereon at 9% per annum . . . immediately upon the Employee committing a breach of any of the conditions contained in this Agreement . . . ."

CAPS maintains this provision violates Labor Code sections 2926 and 2927,[10] since employees must be compensated for all the time they work. Further, it asserts the practice of filing lawsuits seeking to recover earned wages violates Labor Code section 221.[11] CAPS contends these Labor Code violations constitute unlawful business practices under section 17200 and were not addressed in the trial court's statement of decision. The statement

---

[10]Labor Code sections 2926 and 2927 provide that a terminated or quitting employee is "entitled to compensation for services rendered up to the time of" termination or quitting.

[11]Labor Code section 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

of decision likewise does not address CAPS's claims that Tata's policies and practices allegedly violate Labor Code sections 2860, 2802, 224, and 227.3 and Code of Civil Procedure section 1132.

■ It is settled that a judgment by a trial court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227]; *Sammis* v. *Stafford* (1996) 48 Cal.App.4th 1935, 1942 [56 Cal.Rptr.2d 589].)

■ "Under Code of Civil Procedure section 634, a party claiming deficiencies in the trial court's statement of decision must bring those deficiencies 'to the attention of the trial court . . . .' While it is true this section 'does not specify the particular means that the party may use to direct the court's attention to the claimed defects in the statement,' [citation], rule 232(d) of the California Rules of Court provides: 'Any party affected by the judgment may, within 15 days after the proposed statement of decision and judgment have been served, serve and file objections to the proposed statement of decision or judgment.' [¶] Code of Civil Procedure section 634 and California Rules of Court, rule 232, taken together, clearly contemplate any defects in the trial court's statement of decision must be brought to the court's attention through specific objections to the statement itself, not through a proposed alternative statement of decision served prior to the court's issuance of its own statement. By filing specific objections to the court's statement of decision a party pinpoints alleged deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous." (*Golden Eagle Ins. Co.* v. *Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380 [25 Cal.Rptr.2d 242].)

Since the judgment incorporating the trial court's statement of decision is presumed correct and CAPS failed to bring omissions in the statement to the court's attention, CAPS has waived its right to complain on appeal. (*In re Marriage of Arceneaux, supra*, 51 Cal.3d at p. 1132.)

*Unfair Business Practices*

In addition to the alleged statutory violations, CAPS contends Tata engaged in three "unfair" practices: 1) the company resorted to punitive litigation against employees who quit; 2) the allegedly unlawful contract provisions and litigation practice enabled Tata to offer California clients something other California suppliers of temporary computer personnel could not; i.e., "an indentured employee, one who is willing to work on California

projects on illegal terms and below-market wages"; and 3) the deputation agreement specified a 30 percent add-on attorney's fees provision only for recovery by Tata.

Here, again, the statement of decision is silent on the legal effect of these allegations,[12] except for the conclusion that Tata's pricing practices resulted from immigration law. CAPS's failure to bring these deficiencies to the attention of the court waives the argument on appeal.

*Deceptive Practices*

In its statement of decision, the trial court states: "CAPS has not shown that defendant's practices are likely to deceive the public as the *McKale* test requires. Nor were Tata's competitors deceived; Tata's competitors complained that the competition was unfair because of Tata's pricing. CAPS failed to establish its allegations that Tata violated minimum wage laws, employment tax laws, or immigration laws (a question which this court cannot, and does not reach). Plaintiff never attempted to show fraud. All that remains of plaintiff's argument, therefore, is that Tata's pricing was an 'unfair business practice' under § 17200. The pricing, however, resulted from immigration practices. Indeed, it could be argued that Tata's pricing was dictated by immigration law. The court finds that plaintiff has failed to show this was an unfair business practice."

CAPS contends this conclusion was erroneous. ■ Citing *People* v. *McKale, supra,* 25 Cal.3d 626, it maintains that the inclusion of unenforceable terms in a form contract is a deceptive practice under section 17200, because it is likely to mislead the nondrafting party into thinking that the terms might be enforceable.

In *People* v. *McKale, supra,* 25 Cal.3d 626, the Supreme Court concluded it was unfair competition for a mobilehome park operator to require tenants to sign rules and regulations containing unlawful terms. Notwithstanding the defendant's argument that these rules and regulations were not being enforced, the court explained: "When a mobilehome park operator requires tenants to sign park rules and regulations which the park is prohibited by law from enforcing, those tenants are likely to be deceived, and allegations of unfair competition based thereon are sufficient to withstand demurrer." (*Id.* at p. 635.)

---

[12]The only factual finding in the statement of decision regarding any of these allegations is that the various contract provisions and litigation strategy were designed to keep deputed workers on the job until the end of their term.

However, in *Olsen* v. *Breeze, Inc.* (1996) 48 Cal.App.4th 608 [55 Cal.Rptr.2d 818], the plaintiff asserted the defendants' practices were likely to mislead the public regarding their legal rights and cause customers to sign releases they did not understand, thus constituting an unfair business practice. The court disagreed, stating: "The mere fact a release is not sufficiently clear to be enforceable under *all* conceivable circumstances does not render its use unfair competition. We are aware of no general duty owed by one contracting party to another to explain the other's legal rights in connection with the agreement. We will not presume a contracting party who is uncertain regarding the breadth of a release will interpret the document broadly and thereby forego relief which would otherwise be available. We assume contracting parties are aware of their legal rights or will seek competent legal assistance where necessary." (*Id.* at pp. 622-623, italics in original.)

In this instant action, it was stipulated that the Tata documents were legal under Indian law. The mere fact that certain provisions were unenforceable in California does not render the use of the documents an unfair business practice.

In conclusion, we find the trial court correctly determined that CAPS had failed to sustain its burden of proving unfair competition.

## III

### Appeal No. H013638

On or about July 12, 1994, H-P filed its motion for summary judgment. In August of 1994, before the summary judgment motion was heard, CAPS, with leave of the court, filed the second and third amended complaints. On September 7, 1994, the trial court subsequently granted H-P's summary judgment motion.

In this appeal CAPS contends the trial court's order is void because H-P's motion failed to address theories of liability raised in the amended complaints and the court had no jurisdiction to rule on matters not raised in the moving papers. CAPS also asserts it raised a triable issue of material fact as to H-P's liability for the inclusion and enforcement of the unlawful terms in the deputed programmers' contracts. Finally, CAPS argues the evidence produced by H-P was inadmissible.

█ Even if we assume that CAPS's contentions have merit, there can be no prejudice in that court granting summary judgment. Article VI, section 13, of the California Constitution provides that a judgment cannot be set

aside "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." "This fundamental restriction on the power of appellate courts is amplified by Code of Civil Procedure section 475, which states that trial court error is reversible only where it affects 'the substantial rights of the parties . . . ,' and the appellant 'sustained and suffered substantial injury, and that a different result would have been probable if such error . . . had not occurred or existed.' Prejudice is not presumed, and the burden is on the appealing party to demonstrate that a miscarriage of justice has occurred. [Citations.]" (*Waller* v. *TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 [16 Cal.Rptr.2d 38].)

As previously discussed, CAPS failed to meet its burden of proving that Tata's business practices constituted unfair competition under section 17200. Because all CAPS's allegations against H-P were derivative of those charged against Tata, CAPS could not have prevailed in its action against H-P, even if the action had continued through trial. Accordingly, CAPS was not prejudiced by the trial court granting H-P's motion for summary judgment.

## IV

### Appeal No. H014384

*Attorney's Fees*

Following trial Tata moved for an order awarding reasonable attorney's fees pursuant to Labor Code section 218.5. It now appeals from the denial of the motion.

As a general rule, a successful plaintiff can recover attorney's fees only when they are provided for by statute or by agreement of the parties. (Code Civ. Proc., § 1021; *Davis* v. *Air Technical Industries, Inc.* (1978) 22 Cal.3d 1, 5 [148 Cal.Rptr. 419, 582 P.2d 1010].) CAPS brought the present action for injunctive relief under the unfair competition statutes which do not authorize attorney's fees. (*California Service Station etc. Assn.* v. *Union Oil Co.* (1991) 232 Cal.App.3d 44, 58 [283 Cal.Rptr. 279].) The question here presented is whether Tata is entitled to attorney's fees pursuant to Labor Code section 218.5. The interpretation of this attorney's fees statute and its application to the circumstances in this case are questions of law, subject to independent review on appeal. (See, e.g., *City of Lafayette* v. *East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1013 [20 Cal.Rptr.2d 658]; *Haworth* v. *Lira* (1991) 232 Cal.App.3d 1362, 1367 [284 Cal.Rptr. 62].)

"Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the

purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; see also *United Farm Workers of America* v. *Agricultural Labor Relations Bd.* (1995) 41 Cal.App.4th 303, 314-315 [48 Cal.Rptr.2d 696].)

 Labor Code section 218.5 provides in relevant part: "In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action."

On its face the statute is ambiguous when applied to this case. This was not an "action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions." The action was for unfair competition. The prayer did not include unpaid wages or benefits. Indeed, unpaid wages are economic damages which are unavailable in a section 17200 action. (*Heller* v. *Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 45 [32 Cal.Rptr.2d 200, 876 P.2d 999]; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545].) The most that can be asserted is that part of the basis for the claim of unfair competition was the alleged violations of Labor Code statutes.

Tata relies on *California Service Station etc. Assn.* v. *Union Oil Co., supra,* 232 Cal.App.3d 44, as its sole authority for the proposition that it is entitled to attorney's fees under Labor Code section 218.5. In that case, the plaintiff brought an action for injunctive and declaratory relief pursuant to section 17200, alleging that the defendant's franchising policy violated section 21148. The plaintiff prevailed, and the trial court awarded the plaintiff its attorney's fees pursuant to the underlying statute, section 21140.4, which provides for recovery of attorney's fees in actions alleging violations of section 21148.

The Court of Appeal upheld the trial court determination that the franchising policy violated section 21148, but reversed the award of attorney's fees. The court impliedly held that an award of attorney's fees was proper if section 21140.4 applied to the plaintiff. However, section 21140.4 permits attorney's fees only to a person who has suffered damages to business or property. Since the defendant had neither alleged nor proven damages, it was not entitled to attorney's fees under section 21140.4. (*California Service Station etc. Assn.* v. *Union Oil Co., supra,* 232 Cal.App.3d at p. 58.)

Tata concludes that because Labor Code section 218.5 does not limit the award of attorney's fees to injured persons, it is entitled to recover its attorney's fees. Such a conclusion is premature.

In *Midpeninsula Citizens for Fair Housing* v. *Westwood Investors* (1990) 221 Cal.App.3d 1377 [271 Cal.Rptr. 99], this court discussed the problem of standing encountered by public interest groups. The public interest organization challenged the defendant's rental policy under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) and California's unfair competition statute. We found the organization lacked standing to sue under the Unruh Civil Rights Act, since the Legislature had conferred standing to sue to only on the victims of the discriminatory practices and certain designated others, i.e., the district attorneys or city attorneys, or the Attorney General. (Civ. Code, § 52, subds. (a) and (c).) However, the organization had standing to sue on behalf of the general public pursuant to section 17200. (221 Cal.App.3d at p. 1393.)

In reaching this decision we relied on *Consumers Union of United States, Inc.* v. *Fisher Development, Inc., supra,* 208 Cal.App.3d 1433, 1443 [257 Cal.Rptr. 151], where the court observed that the remedies available under the two statutes are not duplicative. Under the Unruh Civil Rights Act, a person denied the rights provided by Civil Code section 51 can recover treble damages and attorney's fees, whereas the unfair competition statute, section 17204, provides only for injunctive relief. (*Midpeninsula Citizens for Fair Housing* v. *Westwood Investors, supra,* 221 Cal.App.3d at p. 1392.) In footnote 3 it was noted that attorney's fees might be available to a public interest organization under the private attorney general statute, Code of Civil Procedure section 1021.5. However, it was nowhere implied that the organization was entitled to attorney's fees under the Unruh Civil Rights Act.

We believe similar reasoning must be applied in the instant action. CAPS does not have standing to bring a direct action under the Labor Code. It is illogical to claim that a party is entitled to attorney's fees pursuant to a statutory scheme wherein it has no standing to bring an action. Accordingly, the trial court correctly denied Tata's motion for attorney's fees.

## DISPOSITION

The judgments and order denying Tata's motion for attorney's fees are affirmed. The parties shall bear their own costs on appeal.

Elia, Acting P. J., and Wunderlich, J., concurred.

The petition of appellant Californians for Population Stabilization for review by the Supreme Court was denied January 21, 1998. Mosk, J., was of the opinion that the petition should be granted.