Filed 7/17/13  Pacific Millennium v. Central Valley Ranch CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PACIFIC MILLENNIUM (U.S.) CORPORATION,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CENTRAL VALLEY RANCH, LLC, et al.,<br><br>Defendants and Respondents. | D059731<br><br><br>(Super. Ct. No. 37-2008-000082275-CU-BC-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.


Higgs, Fletcher & Mack and John Morris for Plaintiff and Appellant

Deuprey & Associates, Dan H. Deuprey; Gilmore, Wood, Vinnard & Magness, David M. Gilmore and Scott L. Jones for Defendants and Respondents.

Pacific Millennium (U.S.) Corporation (PMUS), appeals from a judgment following a bench trial in its lawsuit against Central Valley Ranch, LLC (CVR); Merjan Financial Corporation (Merjan); William J. Barkett (Barkett); and Lisa A. Barkett.

PMUS contends that the trial court prejudicially erred in making certain evidentiary rulings, and that the oral modification of the parties' contractual relationship described in the trial court's statement of decision was an invalid agreement because, according to the evidence presented at trial, it was not supported by new consideration. As we will explain, PMUS's contentions lack merit, and we accordingly affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

Barkett, who is president of Merjan, formed CVR in 2002 for the purpose of owning and operating an almond farm (the farm) in Kern County. The purchase of the farm in May 2002 for $4.3 million was financed by two loans. At its formation, Barkett and Merjan were the sole members of CVR.

Richard Tan was a friend of Barkett and the president of Pacific Millennium Holdings Corporation, which is the parent company for a number of different companies controlled by Tan. In May 2002, in a gesture of friendship, Tan arranged for one of his companies, Mei Gei Trading Co., Ltd., to obtain an irrevocable standby letter of credit in the amount of $1.75 million for the benefit of CVR so that Barkett could borrow money at a more favorable interest rate. Under the arrangement, if Barkett defaulted on the loan, the bank would draw on the letter of credit.

Barkett made one of Tan's companies — Millennium Capital Services — a 50 percent member of CVR after it was agreed that the letter of credit would be kept in place for a longer period. A membership certificate was issued to Millennium Capital Services, and in 2003, when Tan's controller requested that the membership in CVR be

2

assigned to a different company that Tan controlled — PMUS — a new membership certificate was issued to that entity.

As of May 2003, the letter of credit was used to secure a farm operating loan from East West Bank for $1.75 million. In February 2004, the amount of the letter of credit was raised to $2.45 million to guarantee a larger loan from East West Bank (the East West loan). PMUS was a passive member in CVR, with Merjan (through Barkett) actively managing the business.

Around June 2006, Tan — in consultation with executives at PMUS — decided that he no longer wanted to be involved in CVR. Discussions started between Barkett and executives at PMUS about Barkett buying PMUS's membership interest.

As a result of those discussions, Barkett wrote to PMUS's general manager Paul Kaufman on September 29, 2006, proposing that Barkett purchase PMUS's interest in CVR. The letter proposed that Barkett would pay off the outstanding balance of $2.2 million on the East West loan that was secured by the letter of credit (thus obtaining a release of the letter of credit) and would pay PMUS $1.328 million for its share of the equity in CVR. The letter stated that "[t]he deal should close on or before December 31, 2006," and instructed that "[i]f this meets your understanding, please have an authorized representative sign below."

Kaufman responded on October 31, 2006, by sending back an executed signature page, which stated "Agreed and accepted on [date]," but which added the following two sentences at the top of the page: "[PMUS] agrees to sell its *membership* interest in

3

[CVR] for *cash* by December 31, 2006.  Please send us a purchase agreement for the said property at your soonest."[1]

In the bench trial in this action, the trial court ruled that the correspondence between Barkett and Kaufman constituted a valid offer and acceptance of an agreement for Barkett to purchase PMUS's membership interest in CVR in exchange for the release of the letter of credit and a payment of $1.328 million (the letter agreement).[2]

It is undisputed that Barkett did not pay off the East West loan secured by the letter of credit by the agreed-upon date of December 31, 2006, and he made no payment of $1.328 million to PMUS, apparently because he was not able to obtain timely financing.  When the deal did not close during the timeframe identified in the letter agreement, Kaufman and Barkett continued to have discussions about how to accomplish the sale of PMUS's membership.  The evidence on the content of those discussions is in conflict.

Barkett testified that he and Kaufman orally agreed to modify the letter agreement by requiring Barkett to pay down the East West loan secured by the letter of credit by $100,000 each month (which would allow the letter of credit to be reduced by $100,000 each month), with the whole of the East West loan to be paid off in June 2007, and

---

[1]     On December 7, 2006, Kaufman e-mailed Barkett to ask if the closing date for the deal could be moved one day, to January 1, 2007, for tax reasons.  For the sake of simplicity, we will continue to refer to December 31, 2006 as the agreed-upon closing date.

[2]     In its appellate briefing, PMUS has made clear that it does not challenge the ruling about the validity of the letter agreement, although it does not agree with it.

4

removing from the deal the requirement that Barkett pay $1.328 million to PMUS for its share of the equity in CVR.  As Barkett explained, the removal of the $1.328 payment was orally agreed to because Barkett had asked for money back from other deals that he was involved in with Tan.  He claimed that in the other deals, he was owed $1.8 million in connection with investments for which he had not been compensated or reimbursed. Barkett testified, "I asked for my money back.  They said, 'Why don't we just wipe out the equity.'"  According to Barkett, Kaufman agreed that "[PMUS] would walk away from the $1.3 million if I didn't make a claim or ask them for the money I had invested of the $1.8 million."

Kaufman, in contrast, testified that the letter agreement had not been orally modified to remove the payment of the $1.328 million from the deal.  According to Kaufman, in April 2007, he raised the idea of removing the $1.328 payment from the deal if Barkett paid off the East West loan and released the letter of credit *immediately*, but Barkett rejected the idea because he did not have immediate access to the necessary funds.  Kaufman denied that Barkett ever discussed a claim for $1.8 million arising out of other deals involving Tan as a possible basis for removing the $1.328 million payment from the letter agreement on Barkett's buyout of PMUS's membership interest in CVR.

On March 2, 2007, Kaufman wrote an e-mail to Barkett, which stated, "[PMUS] is renewing the [letter of credit] for CVR at US$1.8 million as per our previous agreement where as you agreed to pay down $100,000.00 per month until June when you will buy [PMUS's] membership interest in [CVR]."

5

Starting in December 2006 and continuing through the first half of 2007, Barkett made monthly payments on the East West loan of $100,000, and the letter of credit was reduced on a monthly basis by the same amount. On June 20, 2007, Barkett paid off the East West loan by obtaining financing from another source, and on June 25, 2007, the letter of credit was released. On the day that the letter of credit was released, Barkett sent an e-mail to Kaufman, which stated, "As I am sure you are aware, the line of credit has been paid on June 20. This should end the Central Valley chapter." Kaufman did not respond to the e-mail, although he admits to having received it. Barkett never made a payment of $1.328 million to PMUS for its equity share in CVR as called for in the parties' letter agreement.

In September 2007, an employee at PMUS's parent company wrote to the controller at Merjan to ask that reports for CVR be forwarded to him rather than to a predecessor employee. Merjan's controller replied that there was no longer a requirement for Merjan to provide financial statements to PMUS because it was no longer a member of CVR and the East West loan had been paid in full in June 2007.

PMUS filed a complaint against CVR, Merjan, Barkett and Barkett's wife, Lisa Barkett, on April 18, 2008 (collectively, defendants).[3] Among other things, the operative third amended complaint (the complaint) alleges that in years 2005 through 2007, Barkett and Merjan entered into several loan transactions that encumbered the farm owned by

---

3    Merjan filed a cross-complaint, but — according to PMUS — the causes of action in the cross-complaint were not at issue in the phase of the trial that is the subject of this appeal.

6

CVR. According to the complaint, the loans were not used for the benefit of CVR, and PMUS was not fully informed of the transactions. According to the complaint, PMUS learned of the loan transactions and demanded that the encumbrances be removed from the property, but defendants refused to do so. The complaint also alleges other actions by defendants that purportedly constituted a waste or misappropriation of CVR's funds, and alleges that defendants made false statements that PMUS was no longer a member of CVR.

The complaint asserts 13 causes of action: a derivative claim for breach of the fiduciary duty owed to CVR; a derivative claim for constructive fraud; one derivative claim and two direct claims for breach of contract; a derivative claim and a direct claim for fraud; dissolution of CVR; an accounting; declaratory relief as to the validity and enforceability of the agreement between the parties to transfer PMUS's membership interest in CVR; violation of Corporations Code section 17106 by refusing to allow PMUS to inspect CVR's books and records; slander of title; and a derivative claim for conversion.

The parties stipulated that the trial would be divided into two phases, with the first phase limited to a bench trial on the issue of whether PMUS is presently a member of CVR, or, on the contrary, whether PMUS surrendered its membership interest pursuant to an agreement between the parties.

During the first-phase bench trial, two witnesses presented live testimony, two witnesses testified through designated deposition transcripts, and the content of a final witness's testimony was set forth in a written stipulation.

7

The trial court issued a statement of decision concluding that PMUS no longer held a membership interest in CVR as of June 27, 2007, at the latest. Specifically, the trial court found (1) that the parties had entered into a written agreement for Barkett to buy PMUS's membership interest by paying off the loan secured by the line of credit and paying PMUS $1.328 million for its share of the equity in CVR by January 1, 2007; (2) after Barkett was unable to pay the amount required by the agreed-upon date, the parties negotiated an oral modification of the agreement under which Barkett would not pay PMUS $1.328 million for its share of the equity in CVR, and instead would pay down the loan secured by the line of credit at the rate of $100,000 per month, with the loan fully retired and the letter of credit released by June 2007, in exchange for which PMUS would surrender its membership interest in CVR; and (3) Barkett fully performed according to the terms of the oral modification by paying off the loan and obtaining a release of the letter of credit.

The parties entered into a stipulated judgment in favor of defendants as to any causes of action that may have remained viable following the trial court's statement of decision, and Merjan dismissed with prejudice any remaining viable causes of action in its cross-complaint. PMUS filed a notice of appeal.

8

II

DISCUSSION

A.  *The Trial Court Did Not Err in Excluding Evidence of Written Communications Involving the Parties' Attorneys*

PMUS's first contention is that the trial court erred in certain evidentiary rulings concerning written communications involving the parties' attorneys that took place in April and May 2007.

1.  *Standard of Review*

We apply an abuse of discretion standard of review to the trial court's rulings on the admissibility of evidence.  (*People v. Waidla* (2000) 22 Cal.4th 690, 717 ["Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence."]; see also *People v. Rowland* (1992) 4 Cal.4th 238, 264.)

2.  *Relevant Procedural Background*

In April and May 2007, the attorney for PMUS — William P. Shannahan — and the attorney for Barkett — David M. Gilmore — sent written communications about Barkett's buy-out of PMUS's membership interest in CVR.  Those communications were mentioned in and attached to PMUS's motion in limine requesting that the live testimony of its own attorney, Shannahan, be excluded from trial.

In the motion in limine, PMUS explained that most of the negotiations by Shannahan and Gilmore were conducted through e-mail and letters, which "have been offered as trial exhibits" and to which PMUS was "willing to stipulate to the authenticity

9

and admissibility." PMUS stated that the trial court should exclude Shannahan's testimony so as not to "unnecessarily consume time" and because any testimony about the documents would likely invade the attorney-client privilege. Defendants filed a notice of non-opposition to the motion in limine. The trial court granted the motion, and Shannahan was not called as a witness at trial.

Importantly, however, although PMUS stated in its motion in limine that *it* was willing to stipulate to the admissibility of the correspondence between Shannahan and Gilmore, there is no indication that *defendants* ever agreed to stipulate. Therefore, at trial, when counsel for PMUS attempted to ask questions of Barkett by referring to the content of certain of the correspondence involving Shannahan and Gilmore, counsel for defendants objected to counsel for PMUS making any reference to the statements in those documents. The trial court considered each of the documents at issue and sustained defendants' objections, either based on hearsay or because the documents constituted settlement negotiations covered by Evidence Code section 1152, subdivision (a). PMUS contends that the trial court abused its discretion in sustaining the objections.

3.    *The Trial Court Did Not Abuse Its Discretion*

We consider in turn each of the documents that PMUS contends the trial court should have allowed counsel to refer to during the examination of Barkett.

a.    *Trial Exhibit 17*

The first document, identified at trial as exhibit 17, is a letter from Shannahan (counsel for PMUS) to Barkett dated April 11, 2007. Among other things, the letter contains Shannahan's statement to Barkett that no agreement ever existed between the

10

parties.[4]  Counsel for PMUS attempted to introduce that statement as an inconsistent statement to contradict Barkett's testimony that the parties all "knew" that they had a deal. The trial court ruled that the document could not be introduced to show that Shannahan disputed the existence of a deal because the document would be hearsay, offered for the truth of the matter asserted.  (Evid. Code, § 1200 [" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."].)  The trial court also ruled that the exceptions to the hearsay rule for inconsistent statements (*id.*, § 1235) and statements offered to show a declarant's state of mind (*id.*, § 1250) did not apply.

The document did not contain an inconsistent statement within the meaning of the exception to the hearsay rule (Evid. Code, § 1235) because the statement must be a prior statement by the *witness* testifying at trial.  Specifically, the rule states that "Evidence of statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with *his* testimony at the hearing . . . ."  (*Ibid.*)  Barkett was the testifying witness, but the purportedly prior inconsistent statement was made by *Shannahan*, who was on the other side of the dispute from Barkett.

On the other hand, it does appear that, as counsel for PMUS explained, his purpose for introducing Shannahan's statement was to show Shannahan's statement of

---

4       The letter stated, ". . . you knew that no Purchase and Sale Agreement ever existed nor any transaction consummated.  The only evidence of any discussion is your proposed letter of intent without any specifics of payment terms, Mr. Kaufman's offer to sell [PMUS]'s membership interest for cash and no response was received."

mind as to whether he believed a legally binding agreement had been reached by Kaufman's and Barkett's exchange of letters in September and October 2006. However, under Evidence Code section 1250, "evidence of a statement of the declarant's then existing state of mind . . . is not made inadmissible by the hearsay rule when: (1) The evidence is offered to prove the declarant's state of mind . . . *when it is itself an issue in the action*." (*Ibid*.) Thus, "'[a] prerequisite to this exception to the hearsay rule is that the declarant's mental state or conduct be *factually relevant*.'" (*People v. Geier* (2007) 41 Cal.4th 555, 586, italics added.) The problem here is that Shannahan's opinion about whether the parties had reached a legally binding agreement in late 2006 was not relevant to any legal issue in the case. The existence of an agreement depends on whether the 2006 correspondence between Kaufman and Barkett established an offer, an acceptance and mutual consent (see Civ. Code, § 1550), not on the opinion of one of the parties' attorneys several months *after the fact* when a disagreement had already arisen. (Cf. *Patel v. Liebermensch* (2008) 45 Cal.4th 344, 351, 352 [the "parties' conduct subsequent to the formation of a contract 'including the dispute which arises and the remedy sought,' may be relevant in determining which terms they considered essential," but "few contracts would be enforceable if the existence of subsequent disputes were taken as evidence that an agreement was never reached"].) Therefore, the statement was properly excluded from evidence on the basis that it was not being offered for any *relevant* non-hearsay purpose.

b.     *Trial Exhibit 21*

The second document, identified at trial as exhibit 21, is an April 27, 2007 letter from Shannahan to Gilmore in which Shannahan sets forth an "offer and settlement" to "resolve all outstanding issues concerning [CVR]." The letter expressly states that it is being sent "[p]ursuant to California Evidence Code [section] 1152" and proposes that Merjan and Barkett have the letter of credit released and make a payment of $1.328 million by May 15, 2007, in addition to paying interest from December 31, 2006, and PMUS's attorney fees. In exchange, PMUS would assign its interest in CVR to Merjan.

Counsel for defendants objected to the introduction of this document on several grounds, including that it constituted settlement negotiations made inadmissible by Evidence Code section 1152.

Evidence Code section 1152, subdivision (a) provides: "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it." (*Ibid.*) "[C]ourts have recognized that '"the purpose of section 1152 [is] to promote candor in settlement negotiation[,]"'" and "[e]vidence should be excluded under Evidence Code section 1152 where '[t]he strong public policy favoring settlement negotiations and the necessity of candor in conducting

13

them combine to require exclusion . . . .'" (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 33.)

On its face, the April 27, 2007 letter constitutes an inadmissible settlement negotiation within the meaning of Evidence Code section 1152, subdivision (a). The purpose of the letter is to propose a settlement. Specifically, the letter proposes to resolve the dispute arising out of Barkett's failure to timely satisfy the terms of the letter agreement to buy out PMUS's membership that the parties reached in late 2006.

PMUS argues that "a letter itemizing what the sender thinks the recipient owes him or her and demanding payment, even under threat of legal action, is, in effect, a bill and not an offer in settlement or a document in settlement negotiations." (*Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1477.) However, that principle is not applicable here because Shannahan's letter did not purport to list what Barkett owed to PMUS under the parties' letter agreement. Instead, it was plainly phrased as a proposal to settle the dispute between the parties, and it did not mention or attempt to describe the parties' prior agreement.

PMUS contends that instead of constituting settlement negotiations covered by Evidence Code section 1152, subdivision (a), the April 27, 2007 letter is covered by section 1152, subdivision (c)(2), which states that section 1152 "does not affect the admissibility of evidence of . . . [¶] . . . (2) A debtor's payment or promise to pay all or a part of his or her preexisting debt when such evidence is offered to prove the creation of a new duty on his or her part or a revival of his or her preexisting duty." (*Id*., subd. (c)(2).) According to PMUS, this provision applies because the letter is purportedly a promise by

14

Barkett to pay his preexisting debt created by the terms of the parties' 2006 letter agreement.  However, PMUS has it backwards.  The letter is from PMUS's attorney, Shannahan, rather than from Barkett or his attorney.  The letter therefore cannot constitute a promise by Barkett to pay a preexisting debt or revive a preexisting duty.[5]

### c. *Trial Exhibit 27*

During the examination of Barkett, counsel for PMUS sought to refer to an April 30, 2007 letter from Gilmore to Shannahan, which was identified at trial as exhibit 22.  The letter constituted a brief reply to Shannahan's April 27, 2007 settlement proposal.  In particular, Gilmore stated in the letter that Barkett "accepts the terms" of Shannahan's proposal, with the exception that Barkett did not agree to the deadline of May 15, 2007, and preferred that the transaction close at the end of June.  The letter also observed that the parties should have "a written agreement outlining the terms of settlement among the parties."

At trial, counsel for defendants objected to the letter being referred to at trial because it constituted settlement negotiations made inadmissible under Evidence Code section 1152, subdivision (a).  The trial court sustained the objection, specifically rejecting the argument by counsel for PMUS that the letter was admissible as a ratification of a preexisting debt that arose under the parties' letter agreement.  As the trial

---

[5]     PMUS argues that an April 16, 2007 letter from Barkett's attorney, Gilmore, to Shannahan falls within Evidence Code section 1152, subdivision (c)(2) as a promise by Barkett to pay a preexisting debt.  However, that argument is irrelevant to any issue presented by this appeal.  PMUS did not move for the admission of the April 16, 2007 letter into evidence and did not refer to it during counsel's trial examination of Barkett.

15

court explained, "This is not a ratification of value. This is accepting apparently a proposal from Shannahan, and that's classic 1152. It's not a ratification of anything."

The trial court was well within its discretion to view the April 30, 2007 letter as a settlement negotiation under Evidence Code section 1152, subdivision (a) rather than a promise to pay a preexisting debt under section 1152, subdivision (c)(2). The letter clearly refers to "accept[ing]" the terms of a proposal and refers to a "settlement" among the parties. Further, Shannahan's proposal, to which the letter was responding, did not ask Gilmore to ratify any preexisting debt. Instead, Shannahan's communication was worded as a "settlement" proposal. It was reasonable for the trial court to conclude that in responding to that settlement proposal with a request for different terms, Gilmore was also engaging in settlement negotiations. The April 30, 2007 letter was therefore properly excluded under section 1152, subdivision (a).

d.      *Trial Exhibit 28*

Finally, counsel for PMUS briefly attempted during examination of Barkett to refer to a May 29, 2007 e-mail from Gilmore to Shannahan. That e-mail refers to Barkett's opening of an escrow for the funds to pay off the East West loan, and relates certain statements that Barkett has made to Gilmore about the current deal between the parties. Among other things, Gilmore related that Barkett had told him "based on [Barkett's] conversations with Mr. Kaufman, the pay off of the line of credit will resolve all the outstanding issue between your client and [CVR] and Mr. Barkett." Counsel for defendants objected that the e-mail contained hearsay, and the trial court sustained the objection.

16

The trial court's evidentiary ruling was correct. The e-mail contains multiple layers of hearsay. First, the e-mail's description of what was said during conversation between Barkett and Kaufman refers to the content of the out-of-court statements made by those two individuals, and is accordingly hearsay. (Evid. Code, § 1200 [defining hearsay].) Second, the e-mail's description of Barkett's statement to Gilmore about the conversation between Barkett and Gilmore is also hearsay because it contains the contents of an out-of-court statement made by Barkett to Gilmore. (*Ibid*.) Third, the e-mail itself contains numerous out-of-court statements by Gilmore to Shannahan, which contain several assertions, and therefore constitute hearsay to the extent they are offered to establish the truth of those assertions. (*Ibid*.) Although, some of the layers of hearsay could be admissible as admissions of a party opponent because they were made by Barkett or his attorney (Evid. Code, § 1220), the first level of hearsay does not fall under that category, as it refers to *Kaufman's* alleged communications with Barkett agreeing to the terms of a deal. Kaufman is not a party opponent, but rather PMUS's own attorney.

Further, even if we were to conclude that the e-mail should have been admitted, its exclusion did not prejudice PMUS. An appellate court may reverse a judgment on the ground of erroneous exclusion of evidence only if the error resulted in a "miscarriage of justice" (Cal. Const., art. VI, § 13; Evid. Code, § 354), i.e., only if "the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) The May 29, 2007 e-mail describes a deal which does *not* include a payment of

17

$1.328 million to PMUS.  It therefore supports *defendant's* theory of the case and undermines PMUS's contention that the parties never agreed to modify the agreement to remove the $1.328 million payment.  Because the May 29, 2007 e-mail undermines PMUS's theory of the case, it is not reasonably probable that a result more favorable to PMUS would have occurred if the letter had been admitted into evidence.

B.    *Substantial Evidence Supports an Implied Finding That the Oral Modification Was Supported by New Consideration*

PMUS challenges the trial court's decision that the parties entered into an enforceable oral modification of the agreement for Barkett to buy out PMUS's membership interest in CVR.

PMUS concedes that — based on Barkett's testimony — substantial evidence supports a finding that the parties entered into an oral agreement to modify the original contract that called for Barkett to make a payment of $1.328 million in addition to obtaining a release of the letter of credit.  However, PMUS contends that *even if* the parties made such an agreement, the legal requirements for a valid oral contractual modification were not satisfied because the oral agreement contained no new consideration.

Civil Code section 1698, subdivision (c) provides in part that "[u]nless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration."  It is well established "that a supplemental agreement either adding to or varying the terms of the original contract, so as to impose new and onerous burdens upon one of the parties, requires a consideration to support it."

18

(*Krobitzsch v. Middleton* (1946) 72 Cal.App.2d 804, 808.)  An obligation already owed by the promisee to the promisor is not consideration.  (Civ. Code, § 1605 ["Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise."].)

The trial court's statement of decision stated that consideration for the oral agreement consisted of Barkett's $100,000 per month payments to reduce the East West loan and the benefits obtained by PMUS through the release of the letter of credit.  Based on this statement, the parties focus their briefing on whether those items constituted new consideration.  PMUS argues that under the terms of the parties' letter agreement, Barkett was already bound to pay off the loan in full by December 31, 2006, and to obtain a release the letter of credit.  According to PMUS, Barkett's new promise to gradually pay off the loan in $100,000 increments and then obtain a release of the letter of credit in June 2007 was not new consideration.  In contrast, Barkett contends, among other things, that he was not specifically obligated under the terms of the parties' letter agreement to make incremental monthly payments, and thus the promise to make those payments constituted new consideration.

We need not resolve that particular dispute because, as we will explain, other substantial evidence in the record supports an implied finding that Barkett provided new consideration as a basis for the oral modification.  As we have described, Barkett testified extensively at trial that he informed PMUS that he had a claim for $1.8 million against

19

PMUS arising out of other business ventures with Tan. As Barkett testified, the parties agreed that Barkett would relinquish that $1.8 million claim against PMUS if PMUS agreed to forego payment for its $1.328 million equity share in CVR.

PMUS argues that we should not imply a finding by the trial court that part of the consideration for the oral modification of the letter agreement was Barkett's relinquishment of his $1.8 million claim against PMUS. According to PMUS, because the trial court's statement of decision did not mention the relinquishment of the $1.8 million claim in describing the consideration for the oral modification, "the trial court obviously did *not* accept Barkett's testimony" on that issue. We reject PMUS's argument because — as we will explain — it is contrary to the settled rule that, in the absence of a specific objection to a missing finding in a statement of decision, we will imply all findings, supported by substantial evidence, to support the trial court's decision.[6]

Under Code of Civil Procedure section 634, "[w]hen a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as

---

6     We note that although the trial court's statement of decision did not mention the relinquishment of Barkett's $1.8 million claim against PMUS as part of the consideration for the oral modification, the trial court did refer to it during its discussion with counsel at the conclusion of the trial. The trial court stated that Barkett's claim for $1.8 million "could have been another motivating factor for [PMUS] to want out of this deal."

20

to those facts or on that issue." (*Ibid.*)  On the other hand, "[i]f the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues. [Citations.]  The appellate court then reviews the implied factual findings under the substantial evidence standard." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 59-60 (*Fladeboe*).)  This rule is based on the principle that "a judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

To avoid implied findings, a party must file "'*specific* objections to the court's statement of decision'" to "'pinpoint[] alleged deficiencies in the statement and allow[] the court to focus on the *facts* or issues the party contends were not resolved or whose resolution is ambiguous.'" (*Californians for Population Stabilization v. Hewlett-Packard Co.* (1997) 58 Cal.App.4th 273, 291, italics added.)  Here, PMUS submitted objections to the proposed statement of decision that the trial court requested that defendants prepare and took issue with the legal conclusion that the oral modification was supported by new consideration.  However, PMUS's objections did *not* specify that the trial court omitted a factual finding as to whether Barkett had agreed to relinquish a $1.8 million claim, and PMUS did not ask that the trial court make a finding on that issue.  Because PMUS "fail[ed] to bring omissions or ambiguities in the statement of decision's *factual findings*

21

to the trial court's attention," we "will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment." (*Fladeboe*, *supra*, 150 Cal.App.4th at p. 59, italics added.)

In the absence of a specific objection to the lack of a factual finding on whether Barkett relinquished a claim for $1.8 million against PMUS as part of the oral modification, we will imply a factual finding in favor of defendants on that issue if the record contains substantial evidence allowing us to do so. (*Fladeboe*, *supra*, 150 Cal.App.4th at p. 60.) Here, Barkett's testimony provides the necessary substantial evidence to support the implied finding that new consideration existed for the oral modification. Barkett testified at length that he agreed to relinquish his $1.8 million claim against PMUS in exchange for PMUS relinquishing its entitlement, under the letter agreement, to receive a payment of $1.328 million from Barkett for its share of the equity in CVR. Although Barkett's testimony on the relinquishment of his $1.8 million claim against PMUS was in conflict with Kaufman's testimony, the testimony of one witness is sufficient to provide substantial evidence for an implied factual finding. (Evid. Code, § 411.) We therefore imply a finding that the parties agreed to new consideration for the oral modification, and we reject PMUS's contention that oral modification was invalid and unenforceable for lack of new consideration.[7]

---

[7] Civil Code section 1698, subdivision (b) states that "[a] contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties." As an alternative basis for concluding that the oral modification is valid, defendants contend that the oral modification was fully executed when Barkett timely paid off the loan and obtained a release of the letter of credit. In light of our conclusion

22

DISPOSITION

The judgment is affirmed.

_____
                                                    IRION, J.

WE CONCUR:

_____
         NARES, Acting P. J.

_____
         O'ROURKE, J.

_____
that substantial evidence supports an implied finding of new consideration to support the oral modification, we need not, and do not, decide whether the oral modification was fully executed.